DECISION
Brian McElroy ("McElroy" or "Petitioner") brings this appeal from a decision of the Employees' Retirement System of Rhode Island ("ERSRI"). In its ruling, the Retirement Board ("Board") of ERSRI denied McElroy's application for an accidental disability pension based upon the ERSRI Disability Subcommittee ("Subcommittee") recommendation that McElroy was not physically or mentally disabled from the performance of service as a natural and proximate result of an accident occurring while in the performance of duty. This Court has jurisdiction of Petitioner's timely appeal pursuant to G.L. 1956 § 42-35-15.
 I Facts and Travel
On September 28, 2006, a student in Petitioner's third grade elementary school classroom made forcible contact with Petitioner, a Providence School Department teacher, causing him to lose his balance and hit his head on the floor ("incident" or "accident"). (Ex. 2. and Ex. 7.) Petitioner finished the day of teaching and then visited the Bristol Medical Center and subsequently the Rhode Island Hospital Emergency Room the following morning for a CAT scan, which tested negative. (Ex. 3, R. at 0017.) Petitioner complained at the hospital of a headache, back and shoulder pain, and dizziness. (Ex. 7.) Petitioner has not returned to work since the incident. *Page 2 
Following the incident, Petitioner visited neurologist Vladislav Zayas, M.D. ("Dr. Zayas"), to address his complaints of reoccurring headaches, neck pain, lower back pain, dizziness, and difficulties with his memory, attention, concentration, and sleep. At the initial meeting between Dr. Zayas and Petitioner, on October 24, 2006, Dr. Zayas identified Petitioner as suffering from post-concussion syndrome. (Ex. 3, R. at 0018.) Dr. Zayas scheduled physical therapy for the back and neck pain and a follow up visit in one-and-one-half months. Until that time, Dr. Zayas advised Petitioner to stay out of work. Id. Petitioner proceeded to visit Dr. Zayas seven more times over the next ten months, with Dr. Zayas noting gradual improvement throughout the visits but nonetheless prescribing and adjusting medications to help Petitioner cope with his headaches. (Ex. 3.)
On October 17, 2007, Petitioner submitted his application for an accidental disability pension with ERSRI. (Ex. 2, R. at 0005.) In his application, Petitioner asserted the medical reason for the disability as "[c]ontinuing headaches, dizziness, depression, neckpain and other post-concussion symptoms from a concussion sustained from a student assault on 9/28/06." Along with his application, Petitioner submitted an Applicant's Physician's Statement for Disability completed by Dr. Zayas. Dr. Zayas indicated — by checking a box "YES" — that based upon his examination, the Petitioner was "no longer able to perform the duties of his . . . particular job." (Ex. 3, R. at 0006.)
In accordance with the provisions of G.L. 1956 § 16-16-16, the Retirement Board engaged three medical physicians to examine the Petitioner to determine if Petitioner was "physically or mentally incapacitated for the performance of service as a natural and proximate result of an accident, while in the performance of duty." Sec. 16-16-16(c). The Retirement Board engaged the services of neurologist Thomas Frank Morgan, M.D. ("Dr. Morgan"), *Page 3 
neurologist Gus G. Stratton, M.D. ("Dr. Stratton"), and orthopedic surgeon Kenneth J. Morrissey, M.D. ("Dr. Morrissey").
Petitioner met with Dr. Morgan on January 24, 2008. (Ex. 7.) Dr. Morgan checked the "NO" boxes on the form ERSRI required him to fill out. This response suggested Dr. Morgan did not believe Petitioner was physically or mentally incapacitated such that he could not fulfill the duties of his position. To support his opinion, Dr. Morgan noted:
 it is my opinion that Mr. McElroy did sustain soft tissue pain and strain to his low back and left shoulder and a questionably mild grade 2 concussion. These injuries would be classified as minor and would have a healing time of days to weeks and would not qualify for any permanent work injury impairment or disability. Mr. McElroy does admit to being quite anxious about returning to such a disruptive classroom but from a neurological point of view Mr. McElroy does not have any neurological impairments by AMA Guides that would qualify him for an accidental disability retirement. Based on today's examination, he would be able to carry out his duties as an elementary school teacher with no restrictions. At this time, I do not find Mr. McElroy to have a neurological disability or impairment as a result of his work injury of 9/28/06. (Ex. 7, R. at 0049.)
Also, on January 24, 2008, Petitioner met with Dr. Stratton. (Ex. 8.) Dr. Stratton, unlike Dr. Morgan, checked off the "YES" boxes on the form. This indicated Dr. Stratton believed Petitioner to be physically or mentally incapacitated such that Petitioner would be unable to fulfill his duties at work, and further that the incapacity was the proximate result of the on the job injury Petitioner identified. Dr Stratton's individualized remarks, however, suggested ambivalence:
 [d]iagnoses of the applicant's condition consists of persistent headaches, dizziness due to postconcussive syndrome, cervical and lumbar musculoligamentous strain, both of which have been improving considerably and post-traumatic stress disorder ("PTSD")
 . . . . *Page 4 
 Based on my medical examination it is my opinion to a reasonable degree of medical certainty that the applicant is not physically incapacitated to the extent that he is unable to perform his duties, but because of his diagnosis of PTSD and the fact that he has been assaulted on more than one occasion, I believe that putting him back in that environment would be risky for him from an emotional point of view insofar as he has been diagnosed as having PTSD. Consequently, I would consider him disabled to the specific location but not disabled to his occupation.
 . . . .
 In my opinion, Mr. McElroy would be able to do his job, and I think it would be fair to reassign him to a different location. I think he would have a considerable amount of difficulty going back to the same institution because of the unique circumstances there where it appears that the problem would be site specific rather than career specific.
 . . . .
 In my opinion Mr. McElroy is sufficiently intact neurologically, and I would suggest psychiatrically to be able to perform his job as a teacher. I think he would be better served, however, by relocating in an environment that is not as threatening as the institution at which he was injured. Id., R. at 0054.
Finally, on January 25, 2008, Dr. Morrissey examined Petitioner. (Ex. 9.) Dr. Morrissey — as did Dr. Stratton — checked off the "YES" boxes on the form, indicating he believed Petitioner to be physically or mentally incapacitated from the accident such that Petitioner could no longer fulfill the duties of his job. Also, like Dr. Stratton, Dr. Morrissey qualified his indication that Petitioner would be unable to return to work based wholly on the injuries suffered from the accident. Dr. Morrissey stated:
 [s]ince the accident he states that he has had increasing anxiety and stress. He has been seen by Dr. Michael Friedman and Dr. Crawford.[1] He is being worked up for the anxiety and stress problems that he has. . . . The patient relates all of his current complaints of his neck, his back, inner ear, dizziness, anxiety, and stress to his work-related injury that happened to him in September of 2006. . . . *Page 5 
 . . . .
 Based on physical exam alone of his neck and back I do not really see a lot of objective findings on his neck and back.
 . . . .
 He has a lot of complaints that are non-orthopedic. This man has been out of work for over a year and a half and certainly has no intention of ever going back to work. I think even though there were no major findings on exam of his neck and back, from being out of work for such a long time I do not think this man is capable of going back to work. I am not a psychiatrist but a lot of his symptoms displayed during the exam today, suffering from significant anxiety and stress, and even the thought of going back to work, it is my opinion that with the combination of his injuries and the amount of time that has gone by, this man will not be capable of going back to his normal job as a teacher in the same environment where he has been getting hurt. (Ex. 9, R. at 0057-59.)
On July 2, 2008, the ERSRI Disability Subcommittee issued its recommendation for the full ERSRI Retirement Board. (Ex. 10, R. at 0060-61.) The Subcommittee issued findings of fact, a brief analysis, and its ultimate recommendation.[2] The Subcommittee noted the disability *Page 6 
application material McElroy provided, namely the report of Dr. Zayas and the examinations of the three physicians engaged by the Board pursuant to § 16-16-16(c).[3] *Page 7 
Specifically, the Subcommittee highlighted certain aspects of each of the three physicians' reports. First, the Subcommittee noted that Dr. Morgan believed McElroy's injuries "were minor in nature, and did not constitute permanently disabling injuries." (Ex. 10, R. at 0060.) Next, the Subcommittee highlighted that Dr. Stratton did not causally relate McElroy's symptoms to the accident. It explained, "Dr. Stratton found that there are no objective neurological deficits on examination, and concluded that both neurologically and psychiatrically McElroy is able to perform his job as a teacher. Although he found that it would be emotionally difficult for McElroy to return to the same classroom, he found that he was not disabled from his occupation."Id. at 0061. Finally, the Subcommittee commented on the report from Dr. Morrissey. The Subcommittee found that Dr. Morrissey, like Dr. Stratton, did not causally relate McElroy's symptoms to the particular incident. Id. It noted:
 [a]lthough Dr. Morrissey did check boxes on the forms utilized by the Retirement System indicating that McElroy was disabled as the natural and proximate result of an on the job injury, he stated in his report that he did not see a lot of objective findings in McElroy's neck and back. Rather, Dr. Morrissey felt that McElroy was not capable of returning to work based upon his already having been out of work for such a long period of time. Dr. Morrissey expressed concern that many of the symptoms displayed were the result of anxiety and stress about returning to work. Id.
After touching on the reports of the three physicians and quoting the language of § 16-16-16(c), the Subcommittee stated its belief that McElroy was not entitled to an accidental disability pension. The Subcommittee explained that it found it "significant that none of the three independent medical examiners found that McElroy was physically or mentally disabled from service as a natural and proximate result of an accident in the performance of service. Despite Dr. Morrissey having checked a box indicating that McElroy was disabled, his actual report confirms that McElroy's substantial time out of work is affecting his ability to return, as opposed *Page 8 
to any objective physical problems." Id. at 0061-62. Accordingly, the Subcommittee issued its conclusion that the Retirement Board should deny McElroy's application.
The Retirement Board acted on the Subcommittee's recommendation at a meeting on July 9, 2008. (Ex. 11.) The Board notified Petitioner of his denial and Petitioner's right to appeal the denial in a letter dated July 14, 2008. Id.
On August 12, 2008, Petitioner notified the Board he would appeal the decision, prompting ERSRI to schedule a hearing between the Subcommittee and Petitioner for October 3, 2008. (Ex. 13-14.)
Petitioner submitted a letter from Ronald Mark Stewart, M.D. ("Dr. Stewart"), in support of his appeal. (Ex. 17.) Dr. Stewart psychiatrically evaluated McElroy on July 31, 2008. The report mentioned various medications doctors had prescribed to McElroy for his headaches, anxiety, and post traumatic stress. Additionally, the report mentioned that McElroy had been visiting a Dr. Friedman for anxiety issues over the past six years. Dr. Stewart described McElroy as suffering from intense psychological distress — a typical symptom of PTSD. Dr. Stewart believed it was both in Petitioner's and his students' best interest not to return to his occupation because of the injuries caused by the accident. Id.
On October 3, 2008, Petitioner — with counsel — appeared for an appeal hearing with the Disability Subcommittee. (Ex. 18, Subcommittee Hr'g, Oct. 3, 2008.) Petitioner described the incident to the Subcommittee, explaining that as one student chased another student, the former head butted Petitioner in the stomach as Petitioner tried to intervene. The force from this contact caused Petitioner to slam his head initially against a door, and then the floor as he fell. Id., R. at 0081.
Petitioner argued to the Subcommittee that the accident has caused him great mental anguish. He believed that the Board focused too heavily on potential physical disabilities, *Page 9 
ignoring that he was suffering from PTSD and a mental disability. He contended that Dr. Morgan's analysis was deficient because it only focused on physical criteria. Petitioner asserted that the reports from Dr. Stratton and Dr. Morrissey indicated a mental disability — namely PTSD — and that both concluded that because of the mental disability Petitioner should not return to work as an elementary school teacher in the Providence School Department.[4]Id. at 0079-80.
After Petitioner described the accident and stated that mentally he is unable to teach, the Subcommittee asked Petitioner questions dealing with his anxiety. The following exchange took place between Petitioner and Subcommittee member Christopher W. Ley, M.D. ("Dr. Ley"):
 DR. LEY: Prior to the accident, you had been seeing Dr. Friedman?
 MR.McELROY: Yes
 DR. LEY: What was that for?
 MR.McELROY: Anxiety. Moment-to-moment anxiety. Handling stress within the classroom.
 DR. LEY: Were you taking medication?
 MR.McELROY: Yes, I was. I was taking clonazepam for just general anxiety, because of just that, but also some Lexapro, mainly for anxiety during the school day itself, because of some violence within the classroom. Trying to keep things calm in my mind as I taught, because again, in Providence or any inner city, there's a lot going on, trying to keep the mind at ease.
 DR. LEY: Had you missed any work prior to that as a result of that issue?
 MR.McELROY: As a result of that? I had missed some work because of that. Id. at 0082.
The Subcommittee issued its recommendation on the same day as the hearing that the full Retirement Board deny the application. The recommendation was nearly identical to its previous recommendation issued on July 2, 2008. The recommendation was updated, however, to include a discussion of Dr. Stewart's report and the Subcommittee's analysis of it.[5] (Ex. 19, R. at 0087-89.) *Page 10 
The Subcommittee noted that "Dr. Stewart's letter focuses on a psychological basis for Mr. McElroy's disability which was not mentioned in McElroy's Application, but for which Dr. Stewart acknowledges Mr. McElroy has been receiving treatment for six years." Id. at 0089.
The Retirement Board voted to deny Petitioner's appeal on October 8, 2008. The Board based its decision on the Subcommittee recommendation, attaching the recommendation to the Notice of Denial it sent to Petitioner. (Ex. 20.) Petitioner again appealed the Board decision, this time receiving a hearing with the full Retirement Board on April 8, 2009. (Ex. 25, Board Hr'g, Apr. 8, 2009.)
Petitioner appeared at the Board Hearing represented by counsel. Petitioner asserted that the ERSRI investigation of his disability had been "misplaced" from the beginning and this caused ERSRI to overlook Petitioner's psychological disability. (Id. at 0121.) Despite the "misplaced" investigation, Petitioner asserted that almost every physician that examined him ultimately concluded that he was disabled from continuing as a teacher in the Providence School Department as a result of the injury. *Page 11 
The Board and Petitioner both focused on the significance of Petitioner's diagnoses as suffering from PTSD. The following exchange took place at the hearing:
 BOARD MEMBER KARPINKSKI: One thing I would bring up to the Board to look at on the applicant's disability for retirement, [PTSD] wasn't the reason he applied, it was continuing depression, neck pain and other post-concussion symptoms. The document that would have been sent would have been based on that type of an illness.
 PETITIONER'S ATTORNEY: That was filled out by his neurologist, number one, and number two, he specifically mentions a psychiatric problem, and that's depression. BOARD ATTORNEY: Notwithstanding the mention of depression . . . [t]he material presented by Dr. Stewart indicates that his condition of anxiety was one of a long-standing for which he had been receiving treatment for a number of years, and when Mr. McElroy testified before the Disability Subcommittee in response to questions by Dr. Ley, he acknowledged that he had been treated for this for a period of time, that he had been medicated for a period of time and that he had missed work because of it.
 PETITIONER'S ATTORNEY: Anxiety, yes, tension, yes, PTSD no, and in two of your own independent medical evaluators traces his problem to the 2006 assault.
 . . . .
 PETITIONER: When I went in to see the doctors I told them what I had been taking for medicine, I told them I had been seeing Michael Friedman as a psychiatrist previous to the incident, for basically generalized anxiety. I had a panic attack in the classroom that got to the point where I was out for a number of days because it felt like a heart attack, it wasn't, so my medicine was increased at the point to alleviate the stress from what I thought was a heart attack.[6]
 Now, I went back to school with the medicine in place, and it's two separate events . . . What is in my mind daily since hitting my head, it is definitely different from what was in my head before the incident, that is my problem right now. I'm suffering dizziness, I have headaches, I'm on Topamax, it helps, but it absolutely is still there. I tried to take more Topamax, but I get even dizzier, so I cut back on that. I absolutely have problems with depression, my major point is that I am absolutely worse off after this incident that *Page 12 
took place in the classroom. Granted, I had an issue with anxiety beforehand, but what happened within that that incident when I hit my head, I don't know, but the net result is I am definitely not in great shape right now and it's definitely affected my life negatively.
 . . . .
 BOARD MEMBER HEINTZELAM: Mr. McElroy was under treatment for six years. Now the attack that he had at school, wouldn't that have been something that just could have exacerbated the psychological condition rather than causing the disability.[7]
 PETITIONER'S ATTORNEY: Well, again we're confusing anxiety with PTSD, PTSD, I think is a totally separate diagnosis, and in fact Dr. Stewart's letter specifically says the PTSD rose after the September `06 incident, as does Dr. Stratton and Dr. Morrissey. (Id. at 0122-23.)
At the conclusion of the hearing the Retirement Board voted unanimously to uphold the Subcommittee's findings and thus, denied Petitioner's application for an accidental disability pension. The Board formally notified Petitioner of its decision by mailing him a Notice of Denial ("Notice") on April 9, 2009. The Notice informed the Petitioner that the Board based its decision on the full record and the argument and testimony from the hearing. The Board attached the Subcommittee's recommendation to its Notice.[8] Petitioner timely appealed the Board decision to this Court pursuant § 42-35-15. *Page 13 
 II Standard of Review
The Rhode Island Administrative Procedure Act chapter 35 of title 42 governs this Court's review of an administrative appeal. Section 42-35-15(g) of the Act sets forth that:
 The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Thus, "factual findings of the administrative agency are entitled to great deference." Champlin's RealtyAssoc. v. Tikoian, ___ A.2d ___,2010 WL 565193 at *6 (R.I. Feb. 18, 2010). This Court's review is limited to ensuring that legally competent evidence supports the agency's decision. Nickerson v. Reitsma, 853 A.2d 1202, 1205 (2004). If such evidence exists, this Court is required to uphold the agency's conclusions. Id. This is so even if this Court might be inclined to view the evidence differently and draw different inferences than did the agency below.Barrington Sch. Comm. v. RI Labor Relations Bd.,608 A.2d 1126, 1138 (R.I. 1992). *Page 14 
 III Law and Analysis A Adequacy of the Agency Order
Petitioner's initial contention is that the decision of ERSRI does not meet the requirements of § 42-35-12. Petitioner believes that the Retirement Board failed to provide sufficient findings of facts and conclusions of law. Specifically, Petitioner believes ERSRI neglected to consider his psychiatric issues.
Section 42-35-12 provides that "[a]ny final order shall include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings." Accordingly, our Supreme Court has affirmed a Superior Court ruling remanding an agency decision back to the agency when the decision did not contain any findings of fact and further the record did not contain any transcripts from the agency proceedings. East Greenwich Yacht Club v. Coastal ResourcesManagement Council,118 R.I. 559, 568, 376 A.2d 682, 687 (1977) (noting judicial review impossible without agency's findings of fact); see alsoSobanski v. Providence Employees' Retirement Bd.981 A.2d 1021 (R.I. 2009) (vacating agency decision because review impossible absent findings of fact or conclusions of law). Similarly, our Supreme Court has reversed an agency decision and ordered the Superior Court to issue an appropriate order when the agency failed to consider the relevant regulatory provision.Sakonnet Rogers Inc. v. Coastal Resources ManagementCouncil, 536 A.2d 893, 896-97 (R.I. 1988).
Presently, Petitioner argues the Retirement Board failed to consider his mental unfitness. He believes the Board should have been more vigilant in looking for a mental disability because *Page 15 
he listed "depression" as one of the reasons he was seeking an accidental disability pension. Specifically, he believes the Board was unable to make appropriate findings without having him psychiatrically evaluated. The record, however, does not support Petitioner's assertion.
Preliminarily, Petitioner's attempt to portray the Retirement Board's investigation as "misplaced" from the beginning is not symmetric with the information Petitioner presented to ERSRI. Petitioner informed ERSRI he had suffered an assault and was suffering from post-concussion symptoms. The only material Petitioner submitted to the Board — from his neurologist, Dr. Zayas — contained the evaluations of the eight visits between them and focused almost exclusively on the effect the physical impact the fall had on his headaches, dizziness, and neck and back pain. Although the report mentions depression and refers to mental health issues, the evidence strongly corroborates ERSRI's belief, based on the information Petitioner provided in his application, that the merit of Petitioner's claim would be addressed by an evaluation of the severity of the concussion. Indeed, Petitioner himself sought a neurologist to evaluate him after the fall and chose not to provide ERSRI with any material from his own psychiatrist, Dr. Friedman. (Ex. 7, R. at 0046, Ex. 9, R. at 0057.)
Additionally, Petitioner's argument that ERSRI did not properly consider Petitioner's mental disability is belied by the factual findings and conclusions of the Board. The Board stated "[a]lthough [Dr. Stratton] found that it would be emotionally difficult for McElroy to return to the same classroom, [Dr. Stratton] found that he was not disabled from his occupation." (Ex. 10, R. at 0061.) (Emphasis added.) Similarly, the Board acknowledged a finding of a potential mental disability from the report of Dr. Morrissey. The Board found, however, that Dr. Morrissey's report suggested that "McElroy was not capable of returning to work based upon his already having been out of work for such a long period of time. Dr. Morrissey expressed *Page 16 
concern that many of the symptoms displayed were the result of anxiety and stress about returning to work." Id.
Moreover, to the extent that the Subcommittee's initial recommendation dated July 2, 2008 focused more heavily on physical injuries, this was not the situation as to the decision which Petitioner is appealing. Petitioner submitted the report of a psychiatrist, Dr. Stewart, in support of his appeal. The Subcommittee noted Dr. Stewart's report and considered it when making the recommendation that Petitioner was not mentally disabled as a result of the accident. The Subcommittee noted "Dr. Stewart's letter focuses on a psychological basis for Mr. McElroy's disability which was not mentioned in McElroy's Application, but for which Dr. Stewart acknowledges Mr. McElroy has been receiving treatment for six years." (Ex. 19, R. at 0089.) (Emphasis added.) Further, not only did the Retirement Board adopt the findings of the Subcommittee, but it also specifically questioned Petitioner about his theory of a mental disability arising from the accident as the report of Dr. Stewart suggested. (Ex. 25, Board Hr'g at 0122-23, Apr. 8, 2009.)
Accordingly, this Court finds that the final order of ERSRI contained sufficient findings of facts and conclusions of law to meet the requirements of § 42-35-12. Both the initial ERSRI decision and the ultimate decision from which Petitioner appeals acknowledged that a mental disability, proximately caused by an on the job accident, would entitle Petitioner to an accidental disability pension. Both decisions made factual findings as to the extent and causation of Petitioner's mental disability, and both analyzed those facts to conclude that Petitioner was not entitled to an accidental disability pension. While Petitioner may not agree with those findings or conclusions, that does not entitle him to relief under § 42-35-12. See Ratcliffe v. Coastal Res. *Page 17 Mgmt. Counsel, 584 A.2d 1107, 1111 (R.I. 1991) (applying § 42-35-12 when agency did not support its decision with any facts).
 B Substantial Evidence
Petitioner further argues that the ERSRI decision must be reversed because it was arbitrary and capricious. He believes ERSRI overlooked or misconstrued evidence suggesting that the accident caused him a mental disability which prevented him from working. Specifically, Petitioner believes the Board's findings and conclusions as to the reports of Dr. Stratton and Dr. Morrissey were clearly erroneous and thus, violated substantial rights of the Petitioner.
This Court's review of the factual findings of the agency must conform to the standards set forth in § 42-35-15. Thus, this Court may not substitute its judgment for that of the agency concerning the weight of the evidence on questions of fact. Sec. 42-35-15. The review is limited to ensuring there is legally competent evidence to support the agency's conclusion. Environmental ScientificCorp. v. Durfee, 621 A.2d 200, 208 (R.I. 1983). Legally competent evidence is indicated by the presence of some or any evidence supporting the agency's findings. Id.
The Rhode Island Supreme Court has noted that the Legislature intended the requirements for an accidental disability pension to be "stringent." Rossi v. Employees' Retirement System,895 A.2d 106, 112 (R.I. 2006.) The Legislature sets forth strict guidelines in qualifying for an accidental disability pension because of the distinct ways a state employee can recover pension or disability benefits. Id. A retirement pension in the state retirement system may be based on years of service or because of a disabling condition. Id. at 111. A pension *Page 18 
available because of disability is further divided into two categories: ordinary disability and accidental disability.Id. "When an injury is not work-related or if it is not the result of a specific accident, an employee may nevertheless qualify for an ordinary disability pension." Id. The payout is typically less for this form of disability, however, because the qualifying "conditions . . . are less onerous." Id.
Additionally, employees who suffer work-related injuries also may qualify for workers' compensation benefits.Id. at 112. However, "workers' compensation is not intended as a substitute for retirement, and therefore the standards for receiving benefits are less demanding than the requirements for accidental disability." Id.
To qualify for an accidental disability pension, the employee must meet the requirements of § 16-16-16. Section 16-16-16(c) provides, in pertinent part:
 If a medical examination conducted by three (3) physicians engaged by the retirement board, and any investigation that the retirement board may desire to make, shall show that the teacher is physically or mentally incapacitated for the performance of service as a natural and proximate result of an accident, while in the performance of duty . . . and that the teacher should be retired, the physicians who conducted the examination shall so certify to the retirement board stating the time, place, and conditions of service performed by the teacher resulting in the disability, and the retirement board may grant the teacher an accidental disability benefit.
In the present case, the Retirement Board issued its decision based on the report of the three physicians the Board engaged to examine Petitioner. Additionally, the Board at least acknowledged the report of Dr. Zayas and considered the report of Dr. Stewart. From these sources, the Board had sufficient evidence to either grant or deny Petitioner's application. The Board, however, based on the relevant evidence and the relevant factors, decided that if Petitioner did indeed have a mental disability preventing him from continuing his occupation, something the Board did not concede, that the disability was not the result of Petitioner's on-the-job *Page 19 
accident. Rather, the Board believed that Petitioner had a long standing anxiety issue, and that condition caused Petitioner to seek an accidental disability pension. This Court cannot substitute its judgment for that of the Board as to these questions of fact and must contain its review to a search of the record for competent evidence in support of the Board's decision. Baker v. Dept. ofEmployment and Training Bd. of Review,637 A.2d 360, 363 (R.I. 1994).
The report of Dr. Morgan, without any apparent hesitation, concluded Petitioner did not qualify for an accidental disability. Preliminarily, the report noted that Petitioner's past medical history suggested anxiety and depression issues for which he visited Dr. Friedman. Dr. Morgan believed Petitioner suffered a "mild grade 2 concussion" and that such injuries "would be classified as minor and have a healing time of days to weeks and would not qualify for any permanent work injury impairment or disability." (Ex. 7.) Further, Dr. Morgan acknowledged Petitioner's anxiety, but in no way suggested the accident caused the anxiety. This report by itself would qualify as competent evidence to support the Board's decision regardless of what the other physicians found.Gaines v. Senior Citizens Trans., Inc.,471 A.2d 1357, 1358-59 (R.I. 1984) (observing "any" legally competent evidence sufficient to support findings of fact). Dr. Morgan's conclusion, however, is buttressed by the other physician reports. (Ex. 8-9.) While it is true that both Dr. Stratton and Dr. Morrissey checked boxes indicating Petitioner's accident proximately caused a disability preventing him from working, it is equally true that both reports provided evidence to suggest the opposite.
Dr. Stratton believed that "from an emotional point of view," the accident caused Petitioner difficulties. (Ex. 8.) Dr. Stratton, however, did expressly say that based on those injuries, he would consider Petitioner "disabled to the specific location but not disabled to his occupation." Id. Later in his report, Dr. Stratton made a similar statement, believing the *Page 20 
"problem would be site specific rather than career specific."Id. Finally, Dr. Stewart believed "McElroy is sufficiently intact neurologically, and I would suggest psychiatrically to be able to perform his job as a teacher. I think he would be better served, however, by relocating in an environment that is not as threatening as the institution at which he was injured."Id.
The report of Dr. Morrissey presents many of the same problems for Petitioner as does the report of Dr. Stratton. Dr. Morrissey, like Dr. Morgan, mentions anxiety and stress but does not give any indication of a diagnosis of PTSD. Similarly, Dr. Morrissey did not observe any objective findings that the collision with the floor caused any damage to his neck or back. Although the report of Dr. Morrissey suggests Petitioner had mental issues with returning to work, the Board's interpretation that Dr. Morrissey's report did not proximately relate those mental issues to the accident is supported by the record. The report suggests a variety of factors contributed to Morrissey's belief. Specifically, the report notes anxiety and stress, along with the injuries from the accident, in combination with the time missed since the accident, as making him incapable of returning to work in the same environment as he had previously.
Finally, the report of Dr. Stewart does not mandate a different Board conclusion. Although the Petitioner attempted to differentiate his symptoms of PTSD that Dr. Stewart and Dr. Stratton suggested he had, from his previous anxiety and stress, it is clear that the Board did not find this argument compelling. The Board extensively questioned Petitioner ascertaining that the anxiety and stress Petitioner suffered from prior to the accident were severe enough to cause Petitioner to miss work, indeed to suffer symptoms comparable to a heart attack. (Ex. 25, Board Hr'g at 0122-23, Apr. 8, 2009.) And further, the Board learned that Petitioner did not disclose this previous panic attack to the three physicians. (Ex. 7-9.) Additionally, the Board correctly pointed out that Petitioner himself did not suggest that the accident caused him anxiety or stress *Page 21 
such that he would be unable to fulfill his professional duties. Indeed, Petitioner chose not to provide the Board with information from his psychiatrist, Dr. Friedman. Rather, Petitioner believed the accident caused him headaches and dizziness that caused him "not to be in great shape," but none of the three independent physicians believed the headaches or dizziness would prevent Petitioner from continuing his job as a teacher. (Ex. 25, Board Hr'g at 0123, Apr. 8, 2009.)
On its facts, Petitioner could argue with some merit that this was a close case. The reports of the three medical physicians retained by the Board all suggested that Petitioner had anxiety about returning to work. Dr. Morgan acknowledged the anxiety but did not believe the accident was significant enough to cause any neurological problems and did not suggest the fall caused the anxiety. Dr. Stratton believed the accident caused the Petitioner PTSD, but that Petitioner would be able to continue his job as a teacher, though ideally in a different setting. Dr. Morrissey, without mentioning PTSD, also believed Petitioner was unable to return to work, although he attributed that finding to a combination of anxiety and stress, accident related injuries, and time away from work. Dr. Stewart, who examined Petitioner two years after the accident, believed Petitioner was suffering from the symptoms of PTSD and that he should not return to work.
Ultimately, however, it was the Board's task to interpret the material from the physicians and decide if, in conjunction with all the other evidence it had that it deemed relevant, it should grant an accidental disability pension. Sec. 16-16-16(c) (providing "if . . . medical examination conducted by three physicians . . . and any investigation that the retirement board may desire . . . shall show that the teacher is . . . incapacitated . . . the retirement board may grant the teacher an accidental disability benefit) (emphasis added); see also Bard v. BostonShipping Ass'n, *Page 22 471 F.3d 229, 235 (1st Cir. 2006) (noting deference given to agency when agency has discretion to determine eligibility); Quality CourtCondominium Ass'n v. Quality Hill Dev. Corp., 641 A.2d 746 R.I. 1994 (recognizing rule of statutory construction provides may, as opposed to shall, indicates discretion). The Board, based on the recommendation of the Subcommittee, chose to believe that Petitioner did not have a physical or mental disability preventing him from continuing his occupation, and that if he did, longstanding problems with anxiety and stress caused the disability. To support its decision, the Board made sufficient findings of fact and supported its decision with legally competent evidence. SeeNewport Shipyard v. R.I. Commission for Human Rights,484 A.2d 893, 897 (R.I. 1984) (observing evidence sufficient if reasonable mind might accept it to support a conclusion). Accordingly, this Court must defer to the Board's judgment and affirm its decision denying Petitioner an accidental disability pension.
 IV Conclusion
After a review of the entire record, this Court finds the decision of the Retirement Board did not violate substantial rights of the Petitioner in violation of § 42-35-12 or § 42-35-15. This Court affirms the Retirement Board's finding that Petitioner was not physically or mentally disabled as a proximate result of the injuries Petitioner suffered at work on September 28, 2006. The decision of the Retirement Board was supported with substantial evidence and was neither arbitrary nor capricious. Accordingly, Petitioner's appeal is denied. Counsel shall submit an appropriate order consistent with this Decision.
[1] The record is not clear whether Dr. Morrissey knew Petitioner had been seeing Dr. Friedman for stress prior to the accident.
[2] The Subcommittee made the following recommendation:
 1. McElroy was, at the time of his application, a 48 year-old teacher with the Providence School Department.
 2. McElroy applied for an accidental disability pension on October 17, 2007, based upon "continuing headaches, dizziness, depression, neck pain and other post concussion symptoms from a concussion sustained from a student assault on 9/28/06."
 3. In connection with his application, McElroy submitted an "Accident Report Form," which lists an accident date of September 28, 2006, and refers to the location of the accident as his classroom, but which otherwise does not contain any details as to the nature of the alleged accident.
 4. In support of his application, McElroy submitted a Physician's Statement for Disability form completed by Dr. Vladislav Zayas, M.D. Dr. Zayas referred to the incident on September 28, 2006, and relates the history provided by McElroy to be a push from a student that resulted in a fall to the floor, causing him to strike his head. Dr. Zayas indicated in August of 2007 that McElroy did not feel well enough to return to work.
 5. In connection with his Application, McElroy was examined by Thomas F. Morgan, M.D. on January 24, 2008. Dr. Morgan relates that McElroy reported in fact having two similar falls caused by students, which occurred within a nine day period. Dr. Morgan concluded that McElroy sustained a soft tissue strain and sprain to his low back and left shoulder and a "questionably mild grade 2 concussion," all of which were minor in nature, and did not constitute permanently disabling injuries. Dr. Morgan felt that based upon his evaluation of McElroy, he would be able to carry out his duties as an elementary school teacher without restriction.
 6. In connection with his Application, McElroy was examined by Dr. Gus Stratton, M.D. on January 24, 2008. Dr. Stratton also referred to two incidents involving students, but did not causally relate McElroy's symptoms to either particular incident. Dr. Stratton found that there are no objective neurological deficits on examination, and concluded that both neurologically and psychiatrically McElroy is able to perform his job as a teacher. Although he found it would be emotionally difficult for McElroy to return to the same classroom, he found that he was not disabled from his occupation.
 7. In connection with his Application, McElroy was examined by Kenneth J. Morrissey, M.D. on February 11, 2008. Dr. Morrissey also referred to two incidents involving students, but did not causally relate McElroy's symptoms to either particular incident. Although Dr. Morrissey did check boxes on the forms utilized by the Retirement System indicating that McElroy was disabled as the natural and proximate result of an on the job injury, he stated in his report that he did not see a lot of objective findings in McElroy's neck and back. Rather, Dr. Morrissey felt that McElroy was not capable of returning to work based upon his already having been out of work for such a long period of time. Dr. Morrissey expressed concern that many of the symptoms displayed were the result of anxiety and stress about returning to work.
 . . . .
 After a review of the relevant materials, the Subcommittee finds that McElroy is not physically or mentally incapacitated for the performance of service as a natural and proximate result of an accident while in the performance of duty, as is required by the statute. The Sub-Committee finds it significant that none of the three independent medical examiners found that McElroy was physically or mentally disabled from service as a natural and proximate result of an accident in the performance of service. Despite Dr. Morrissey having checked a box indicating that McElroy was disabled, his actual report confirms that McElroy's substantial time out of work is affecting his ability to return, as opposed to any objective physical problems. Therefore, the Sub-Committee recommends denial of this application. (Ex. 10.)
[3] The Subcommittee quoted the language of § 16-16-16(c) in full. It provides:
 If a medical examination conducted by three (3) physicians engaged by the retirement board, and any investigation that the retirement board may desire to make, shall show that the teacher is physically or mentally incapacitated for the performance of service as a natural and proximate result of an accident, while in the performance of duty, and that the disability is not the result of willful negligence or misconduct on the part of the teacher, and is not the result of age or length of service, and that the teacher has not attained the age of sixty-five (65) years, and that the teacher should be retired, the physicians who conducted the examination shall so certify to the retirement board stating the time, place, and conditions of service performed by the teacher resulting in the disability, and the retirement board may grant the teacher an accidental disability benefit.
[4] The record does not reflect that Dr. Morrissey diagnosed Petitioner with PTSD. It does, however, mention significant anxiety and stress. (Ex. 9, R. at 0059.)
[5] The Subcommittee recommendation included the following additional findings and analysis:
 8. Mr. McElroy's Application was initially denied by the Disability Subcommittee on July 2, 2008, which denial was subsequently affirmed by the Retirement Board on July 9, 2008. By letter dated August 12, 2008, Mr. McElroy appealed the decision before the Disability Subcommittee on October 3, 2008, at which Mr. McElroy appeared, represented by counsel.
 9. Prior to the October 3, 2008 Hearing, McElroy had forwarded to the Disability Subcommittee a letter of Ronald Mark Stewart, M.D. Dr. Stewart's letter indicated that in his opinion, "Mr. McElroy is not capable of appropriately disciplining students in a classroom setting." Dr. Stewart also noted that "Mr. McElroy has been in psychiatric treatment for anxiety with Doctor Friedman for nearly six years." At the October 3, 2008 hearing, Mr. McElroy testified, and his counsel argued, that he was psychologically disabled from working as a teacher.
 . . .
 The Subcommittee further finds it significant that Dr. Stewart's letter focuses on a psychological basis for Mr. McElroy's disability which was not mentioned in McElroy's Application, but for which Dr. Stewart acknowledges Mr. McElroy has been receiving treatment for six years. (Ex. 19, R. at 0088-89.)
[6] The record does not contain any indication that Petitioner informed the three medical examiners or Dr. Stewart that he had missed some work on a prior occasion because his anxiety had previously caused a panic attack.
[7] An accidental disability pension is available for a state employee who reinjures or aggravates a previous injury. The requirements are set forth in § 16-16-16 (b), which provides:
 b) The application shall be made within five (5) years of the alleged accident from which the injury has resulted in the teacher's present disability, and shall be accompanied by an accident report and a physician's report certifying to the disability; provided, that, if the teacher was able to return to his or her employment and subsequently reinjures or aggravates the same injury, the application shall be made within the later of five (5) years of the alleged accident or three (3) years of the reinjury or aggravation. The application may also state that the teacher is permanently and totally disabled from any employment.
[8] The Board attached the Subcommittee Recommendation from Petitioner's initial rejection, dated July 2, 2008. Petitioner contends that by attaching this decision — as opposed to the decision dated October 8, 2008 — the Board failed to make factual findings as to Dr. Stewart's report and thus, disregarded relevant evidence. This error — if it can even be called one — resulted in no prejudice to Petitioner or to this Court's review, and to give it merit would elevate form over substance to an unacceptable level.See New Harbor Village, LLC v. Town of New Shoreham Zoning Bd. ofReview, 894 A.2d 901 (R.I. 2006) (recognizing our Supreme Court refuses to elevate form over substance). The Board attached its findings and conclusions as to Dr. Stewart's report to its Notice of Denial — which it sent to Petitioner — after its October 8, 2008 decision. Further, the Board questioned Petitioner about Dr. Stewart's report at the actual hearing when it denied his final appeal. Lastly, the Board informed Petitioner its decision was based on the full record and the hearing, and included both the Subcommittee recommendation and hearing in the record. (Ex. 20, Ex. 24.)